IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRANDON CURTIS FORD, | ) | CASE NO.  1:19-CV-02456-JG |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES GWIN |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Brandon Curtis Ford ("Plaintiff" or "Ford") challenges the final decision of Defendant Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

In July 2016, Ford protectively filed an application for SSI, alleging a disability onset date of July 20, 2016 and claiming he was disabled due to foot problems, depression, anxiety, and restlessness. (Transcript ("Tr.") 15, 180.)  The application was denied initially and upon reconsideration, and Ford requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

On January 9, 2018, an ALJ held a hearing, during which Ford, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On October 2, 2018, the ALJ issued a written decision finding Ford was not disabled. (*Id.* at 15-24.) The ALJ's decision became final on September 27, 2019, when the Appeals Council declined further review. (*Id.* at 1-6.)

On October 21, 2019, Ford filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 11, 14.) Ford asserts the following assignment of error:

> (1) The ALJ's analysis of Mr. Ford's pain and other limitations was contrary to law and not supported by substantial evidence, [sic] and was not made according to proper legal standards.

(Doc. No. 11 at 9.)

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Ford was born in December 1983 and was 34 years-old at the time of his administrative hearing (Tr. 15, 23), making him a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 416.963(c).  He has at least a high school education and is able to communicate in English.  (Tr. 23.)  He has past relevant work as a mail clerk.  (*Id.*)

### B.   Medical Evidence[2]

On July 1, 2016, Ford saw Mirica A. Stevens, D.O., for a psychiatric assessment.  (Tr. 268, 270.) He reported always feeling the need to do something and being "very 'anxious.'"  (*Id.* at 268.)  He told Dr.

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  Further, the Court's discussion of the medical evidence is limited to Ford's mental impairments, as Ford's discussion of the evidence is likewise so limited, and Ford does not challenge the ALJ's findings regarding his physical impairments.  (Doc. No. 11 at 6-11.)  Although Ford alleges the ALJ erred in his assessment of his pain, Ford does not discuss his physical impairments in his brief.  (*See* Doc. No. 11.)

Stevens a supervisor at his work recommended he see someone as a result of his behavior at work. (*Id.*) Ford reported a low frustration tolerance, depression, and anger. (*Id.*) He also told Dr. Stevens he continued to be restless, anxious, and have racing thoughts. (*Id.*) He said he got less sleep because he needed to check on his loved ones and always needed to be doing something. (*Id.*) Ford reported not going to work as a result of his "frustrations" and had not been at work for about a week. (*Id.*) He did not want to get into trouble "because of other people making him angry." (*Id.*)

On examination, Dr. Stevens found Ford was restless, his anxiety was high, and he was obsessed with illness and finances, although his memory was good. (*Id.* at 269.) He smoked 3-4 marijuana "blunts" a day. (*Id.*) Dr. Stevens determined Ford's behavior was appropriate, his mood depressed, his affect full and appropriate to topic, and his associations intact and linear. (*Id.* at 269-70.) He was oriented times four and his judgment was fair. (*Id.* at 270.) Dr. Stevens diagnosed Ford with Generalized Anxiety Disorder and Major Depressive Disorder, recurrent, severe, without psychotic symptoms, along with THC abuse. (*Id.*) Dr. Stevens assessed a Global Assessment of Functioning ("GAF") score of 41-50, indicating serious symptoms or serious impairment in social, occupational, or school functioning. (*Id.*) Dr. Stevens started Ford on Remeron and hydroxyzine. (*Id.*)

On August 26, 2016, Ford completed an Adult Function Report. (*Id.* at 192-201.) He reported his mother and aunt call him every day to remind him to dress, bathe, shave, do his hair, and take his medication. (*Id.* at 194, 197.) He could feed himself and use the bathroom on his own. (*Id.* at 194.) He could be around people for a "limited amount of time" because his anxiety is high. (*Id.* at 195.) He was not interested in doing house or yard work. (*Id.* at 196.) He left his house every day, either by walking, driving a car, or riding in a car. (*Id.*) He could drive and go out alone. (*Id.*) He did not shop often, but he would go with his mother to get clothes, shoes, and groceries. (*Id.*) His mother and aunt pay his bills, but he could count change, handle a savings account, and use a checkbook/money orders. (*Id.*) His mother

cooked for him because he did not want to cook, and food did not taste good when he cooked.  (*Id.* at 197.)  His mother paid for someone to clean his house.  (*Id.*)  He reported he could "only socialize for a short period of time" because he was too nervous and anxious to be around a lot of people, and he could pay attention for a "very short time."  (*Id.* at 198.)  Ford said he did not finish what he started, and he did not follow spoken instructions well.  (*Id.*)  With help he could follow written instructions well, or sometimes he put it off until he forgot, and then he got his mother to help him do what is needed.  (*Id.*)  He would play cards, watch movies, or have cookouts with friends, on occasions such as holidays and birthdays.  (*Id.* at 199.)  He attended church weekly and went to his mother's house every day.  (*Id.*)  Ford explained that after the death of his fiancée earlier that year, he had "no interest in anything," a shortened attention span, and he felt like he had "no hope for anything anymore."  (*Id.* at 200.)  He did not handle stress well, and changes in routine bothered him to the point where he got confused, then hyper, nervous, and anxious.  (*Id.* at 201.)

On December 30, 2016, Ford saw Dr. Stevens for follow-up and medication management.  (*Id.* at 300.)  Ford reported this time of year was hard for him because of losing his fiancée last year, and that he had been having crying spells, a depressed mood, and a decrease in appetite.  (*Id.*)  Ford told Dr. Stevens he had not been taking his Remeron since November because it made him feel more irritable.  (*Id.*)  Ford reported "some THC abuse" but said he would stop "in order to get medication in aid in relief of anxiety, depression, and panic attacks."  (*Id.*)

On examination, Dr. Stevens determined Ford's interval progress was "[s]lightly worse."  (*Id.*)  Dr. Stevens found Ford had clear and distinct speech, intact associations, a logical, coherent, and rational thought process, and an appropriate and adequate fund of knowledge.  (*Id.* at 301.)  Ford was oriented times four, his recent and remote memory were intact, and his concentration was variable.  (*Id.*)  Dr. Stevens determined Ford's mood was depressed and he had a tearful affect.  (*Id.*)  Dr. Stevens changed

4

Ford's primary diagnosis to Major Depressive Disorder, recurrent, severe without psychotic symptoms, anxiety NOS.  (*Id.*)  Dr, Stevens assessed a GAF score of 41-50, indicating serious symptoms or serious impairment in social, occupational, or school functioning.  (*Id.*)  Dr. Stevens substituted Wellbutrin for the Remeron.  (*Id.*)

On January 5, 2017, Ford underwent a consultative psychological evaluation with Michael Faust, Ph.D.  (*Id.* at 284-292.)  Ford attended the evaluation alone and had driven himself to the office.  (*Id.* at 284.)  Ford told Dr. Faust the reason for his disability was that he was "suffering from significant 'anxiety and stress' and said that he has been dealing with depression, which he believes impairs his ability to work."  (*Id.* at 285.)  Ford reported having a close relationship with his mother and his brother and had recently become closer with his half-sister.  (*Id.*)  He told Dr. Faust he was still grieving his fiancée and cried numerous times discussing his sadness over her death.  (*Id.*)  Ford reported working as a parking attendant with the City of Cleveland, telling Dr. Faust he worked "'20 hours on a good day' and usually works between 1-5 days per week."  (*Id.* at 286.)  Ford "denied any difficulty performing his job duties."  (*Id.*)  Ford reported he was not looking for full-time work at the time and said he had been "very stressed" since his fiancée died.  (*Id.*)

Ford told Dr. Faust he had struggled with "significant depression since before his fiancée died," but that it had gotten worse since she was killed in a car accident in February 2016.  (*Id.*)  He cried "numerous times" discussing his loss.  (*Id.*)  Ford reported "thinking about dying and giving up" since her death and told Dr. Faust he was tired.  (*Id.*)  Ford described intrusive memories, although not all the time, and said he could be irritable and "easily set off."  (*Id.*)  He told Dr. Faust he cried on a daily basis and was "jumpy," "very alert," and "hypervigilant."  (*Id.*)  Ford "described his typical mood as 'frustrated.'"  (*Id.*)  Ford told Faust he had a driver's license and drove independently.  (*Id.* at 287.)  He could use public transportation without any problems.  (*Id.*)  Ford reported he had used marijuana since he was a teenager

5

and smoked it daily.  (*Id.*)  Dr. Faust noted Ford "smelled very strongly of marijuana."  (*Id.*)

On examination, Dr. Faust found Ford responded to his questions with "detailed yet fairly simplistic answers."  (*Id.*)  While Ford "presented as passive and depressed," he "was motivated to complete the examination with good effort."  (*Id.*)  Ford's speech was clear, and he demonstrated "no difficulty in understanding simple or complex questions," although he used "fairly simplistic" speech patterns.  (*Id.*)  While Ford spoke softly, his rate of speech and of responding were normal.  (*Id.*)  While Ford exhibited a "despondent tone and facial expressions," "he made consistent good eye contact."  (*Id.* at 288.)  Ford appeared depressed and anxious, with a blunted affect, shaking his legs, and shifting in his seat.  (*Id.*)  Dr. Faust noted Ford's energy level seemed low, he looked fatigued, and he reported having trouble sleeping.  (*Id.*)  Ford also reported "passive thoughts of dying and giving up."  (*Id.*)  He "appeared frustrated and easily confused" and he "tended to become agitated," especially when discussing his fiancée's death.  (*Id.*)  However, Ford showed no difficulty in tracking the conversation and demonstrated logical and linear thinking.  (*Id.*)  "He exhibited an adequate frustration tolerance and put forth good effort in interacting and completing mental status tasks."  (*Id.*)  While Ford was depressed and withdrawn, he showed no difficulty in understanding questions.  (*Id.*)  He completed serial sevens without difficulty and repeated six digits forward and four digits backwards.  (*Id.*)  Ford responded to Dr. Faust's questions with "adequately developed responses."  (*Id.*)

Ford told Dr. Faust he lived alone in a house he had shared with his fiancée across the street from his mother's house.  (*Id.* at 289.)  Ford reported he worked part-time, 1-5 days a week as a parking attendant.  (*Id.*)  Ford told Dr. Faust most days he wakes up and spends most of the day at his mother's house; he said he was never alone.  (*Id.*)  On Sundays, he has dinner with his mother, brother, and his brother's family.  (*Id.*)  Ford reported no other social interests and that he does not see friends.  (*Id.*)  He watched television and played video games.  (*Id.*)  His mother did his laundry and helped with household

6

chores.  (*Id.*)

Dr. Faust diagnosed Ford with Major Depressive Disorder, recurrent, severe without psychotic symptoms, as well as cannabis use disorder.  (*Id.*)  Dr. Faust opined that Ford "did not exhibit any significant limitations in understanding, remembering, and/or carrying out instructions,"  but further opined Ford "may experience some difficulty remembering and carrying out instructions for task completion due to lapses in sustained attention secondary to his depression, which were observed in the context of the mental status exam." (*Id.* at 290.) Dr. Faust noted Ford "denied any difficulty performing his work duties as a parking attendant."  (*Id.*)  Dr. Faust opined Ford "tended to be mildly distracted," which he viewed as a "function of [Ford's] significant depression and emotional reaction" during the consultative examination.  (*Id.*)  While Ford "remained fairly persistent for mental status tasks, he was receiving one-on-one interactions which likely assisted him in remaining focused and on task." (*Id.*)  Dr. Faust opined Ford had "some limitations" in attention, concentration, persistence, and pace, and Ford "would likely exhibit increased difficulty in those areas when he does not receive one-on-one instruction and interactions." (*Id.*)  However, Dr. Faust again noted Ford "denied any difficulty performing his work duties as a parking attendant." (*Id.*)

Regarding Ford's abilities and limitations in responding appropriately to supervisors and coworkers, Dr. Faust noted Ford had been working up to 20 hours a week as a parking attendant "and denied any difficulty getting along with coworkers."  (*Id.* at 291.)  Dr. Faust opined Ford had "some limitations with regard to responding appropriately to supervision or to coworkers in an employment setting due to his continued depression which results in significant tearfulness and social withdrawal; however, he denied any difficulty interacting with others at work." (*Id.*)  Regarding Ford's abilities and limitations in responding appropriately to work pressures, Dr. Faust opined Ford had "limitations in his ability to respond to work pressures in an employment setting due to symptoms associated with a

significant major depressive disorder," but Ford had "been working part-time as a parking attendant for the past year and works approximately 20 hours per week.  He denied any difficulty performing his job duties and is motivated to continue working as it allows him to get out of the house and takes his focus off his sadness over the loss of his fiancée." (*Id.*)  Dr. Faust further opined Ford did not appear to be able to manage his own funds if awarded benefits because of his ongoing cannabis use. (*Id.*)

On January 20, 2017, Ford saw Dr. Stevens for follow-up and medication management.  (*Id.* at 304.)  Ford denied any medication side effects.  (*Id.*)  He reported better sleep and more energy, and that he had motivation "to go to the gym and 'go play ball.'" (*Id.*)  Ford continued to have crying spells when he thought about his fiancée.  (*Id.*)  He continued to not want to be around people, but he was like that before his fiancée died.  (*Id.*)

On examination, Dr. Stevens found Ford had clear, distinct speech, normal language, intact associations, an appropriate and adequate fund of knowledge, and a logical, coherent, and rational thought process.  (*Id.* at 305.)  Ford was oriented times four.  (*Id.*)  While Ford exhibited a depressed mood and variable concentration, he had a full affect and his recent and remote memory were intact.  (*Id.*)  Dr. Stevens found Ford's interval progress to be "[s]lightly improved." (*Id.*)  Dr. Stevens assessed a GAF score of 51 to 60, reflecting moderate symptoms or moderate difficulty in social, occupational, or school functioning.  (*Id.*)  Ford's diagnoses at that visit remained the same, other than the addition of grief.  (*Id.* at 305-06.)

On February 22, 2017, Ford again saw Dr. Stevens for follow-up and medication management.  (*Id.* at 309.)  Ford told Dr. Stevens he was "doing 'ok,'" and continued to have "ups and downs." (*Id.*)  Ford reported he continued to have "some associated guilt" with his deceased fiancée, as well as continued depression, crying spells, lack of interests, and isolating.  (*Id.*)  On examination, Dr. Stevens found Ford's interval progress to be the same.  (*Id.*)  Ford exhibited clear, distinct speech, normal language, intact

associations, an appropriate and adequate fund of knowledge, and a logical, coherent, and rational thought process.  (*Id.* at 310.)  Ford was oriented times four.  (*Id.*)  While Ford exhibited a depressed mood and scattered concentration, he had a full affect that was appropriate to the topic and his recent and remote memory were intact.  (*Id.*)  Dr. Stevens assessed a GAF score of 51 to 60, indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning, and updated Ford's diagnoses to include "complicated grief."  (*Id.*)

On May 3, 2017, Ford again saw Dr. Stevens for follow-up and medication management.  (*Id.* at 315.)  Ford told Dr. Stevens he was "doing better" and still having good days and bad days.  (*Id.*)  Ford reported he continued to work as a parking attendant and that "he is able to 'find a way' to function at work during his 'bad days.'"  (*Id.*)  Ford used "his coping skills to get through the day."  (*Id.*)  Ford continued to deny side effects of his medications but asked about Xanax because he felt he needed "something to calm him down immediately during a [sic] anxious episode."  (*Id.*)

On examination, Dr. Stevens found Ford's interval progress to be slightly improved.  (*Id.* at 316.)  Ford exhibited clear, distinct speech, normal language, intact associations, an appropriate and adequate fund of knowledge, and a logical, coherent, and rational thought process.  (*Id.*)  Ford was oriented times four.  (*Id.*)  Ford exhibited a euthymic mood, full and appropriate affect, normal concentration, and his recent and remote memory were intact.  (*Id.*)  Dr. Stevens assessed Ford's GAF score as 61-70, indicating "[s]ome mild symptoms or some difficulty in social, occupational, or school functioning but generally functioning pretty well."  (*Id.* at 317.)  Ford's diagnoses remained the same.  (*Id.*)

On September 20, 2017, Ford again saw Dr. Stevens for follow up and medication management.  (*Id.* at 324.)  Ford reported he had slept "ok overnight" and that "'today is a better day.'"  (*Id.*)  Ford told Dr. Stevens he was still anxious, although he denied worrying.  (*Id.*)  Dr. Stevens discouraged Plaintiff from applying for disability benefits because his work situation distracted him from his depression.  (*Id.*)

Ford complained of increased anxiety when thinking of his deceased fiancée and "request [sic] previously prescribed Xanax."  (*Id.*)  Ford denied cannabis use at the time.  (*Id.*)  Dr. Stevens encouraged Ford to continue to see his therapist.  (*Id.*)

On examination, Dr. Stevens found Ford's interval progress to be the same.  (*Id.*)  While Ford had a depressed mood and anxiety interfered with his concentration, he had a full affect, his recent and remote memory were intact, and he denied any suicidal ideation.  (*Id.* at 325.)  Dr. Stevens assessed a GAF of 51 to 60, indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning. (*Id.*)  Ford's diagnoses remained the same.  (*Id.*)  Dr. Stevens prescribed Xanax.  (*Id.*)

## C.    State Agency Reports

On September 23, 2016, Cynthia Waggoner, Psy.D., opined Ford had mild limitation in his activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  (*Id.* at 63.)  Dr. Waggoner found Ford moderately limited in his abilities to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted, complete a normal workday and workweek without interruptions from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id.* at 65.)  Dr. Waggoner opined Ford "is capable of sustaining concentration and persistence to complete 1 and 2 step repetitive tasks in a work environment."  (*Id.*)  Dr. Waggoner also found Ford moderately limited in his abilities to interact with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting.  (*Id.* at 65-66.)  Dr. Waggoner opined Ford was capable of "superficial social interactions" and "work that does not have strict production standards."  (*Id.* at 66.)

On January 20, 2017, Todd Finnerty, Psy.D., on reconsideration found Ford was mildly impaired in his abilities to understand, remember, or apply information, interact with others, and adapt or manage himself. (*Id.* at 77.) Dr. Finnerty found Ford moderately impaired in his ability to concentrate, persist, or maintain pace. (*Id.*) Dr. Finnerty opined Ford's abilities to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods were moderately limited, but he could "sustain a static set of tasks without fast pace." (*Id.* at 80.) Dr. Finnerty affirmed Dr. Waggoner's findings that Ford was moderately limited in his abilities to interact with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. (*Id.* at 80-81.) Dr. Finnerty agreed Ford could interact with others superficially. (*Id.* at 81.) Dr. Finnerty opined Ford was "capable of adapting to changes in a workplace." (*Id.*)

**D.     Hearing Testimony**

During the January 9, 2018 hearing, Ford testified to the following:

- He has stayed at his mother's house off and on for the past one or two years since his fiancée died. (*Id.* at 37.) Most of the time during the day he is at his mother's house. (*Id.*) He spends a typical day sitting around, playing with the dog, and watching a little bit of television. (*Id.*) He does not cook, and he has no kitchen at his house currently as it is under renovation. (*Id.* at 37-38.) He eats at his mother's or she will buy takeout. (*Id.* at 37.) He does not clean or do yard work, although he helps carry groceries inside the house for her. (*Id.* at 38.) He does not clean his own house. (*Id.*) His mother has someone come in and clean his house. (*Id.*) Before his fiancée died, they both took care of things around the house. (*Id.*)

- He works part-time as a parking attendant. (*Id.* at 39.) He sits in a booth and gets out to help people if they have problems with the machine to swipe their credit cards. (*Id.*) He sits in a booth by himself all day and just watches people enter and exit the garage unless they have a problem with their credit card. (*Id.* at 40-41.) He works 12 hours a week "at the most," sometimes working three days a week, sometimes working two days a week. (*Id.* at 39.) He was working "a little bit more" before his fiancée died. (*Id.*) He took time off work after she died, but after retuning to work there were days he just could not go to work. (*Id.*) He estimated that happened "maybe once or twice a week or something." (*Id.*) His supervisor understood and his

11

work put him in a grievance program.  (*Id.* at 40.)  His boss recommended he get therapy.  (*Id.*)  He missed work as a result of his depression for "a month or two," and then went back to working part-time regularly, although it was less hours.  (*Id.*)  As long as he does not have to stand for a long time because of pain in his feet, he haa no problem doing his job.  (*Id.* at 41.)  Ford felt he could work more hours as long as he did not have to stand on his feet and the hours were available.  (*Id.*)

- His depression and anxiety started after his fiancée died.  (*Id.* at 46-47.)  He went to counseling, started therapy, and he is doing better now, although some days are better than others.  (*Id.* at 47.)  On bad days, he does not want to do anything.  (*Id.*)  Sometimes he has bad days on days he is supposed to work.  (*Id.* at 48.)  When that happens and he's "real bad," Ford will talk to his supervisor, who will give Ford a few minutes to try and gather himself.  (*Id.*)  He has called off work because of this, including recently, although not this year.  (*Id.*)  In the past year, he called off "maybe five or six times."  (*Id.*)  His supervisor is "very understanding."  (*Id.*)  Seeing a psychologist and therapist help, as do his medications.  (*Id.* at 48-49.)  He had only been on Xanax for four months, but it is helping.  (*Id.* at 49.)  The Remeron helps him sleep sometimes, but sometimes it does not.  (*Id.*)  He provided a clean urine screen in order to get the Xanax prescription.  (*Id.*)

- He has trouble being around a lot of people.  (*Id.* at 50.)  He has always not wanted to be around a lot of "stuff," but it has been worse since his fiancée died.  (*Id.* at 51.)  If he is in a group of people, he gets irritated easily.  (*Id.*)  He does not like a lot of noise "and a lot of stuff going on."  (*Id.*)  He does not "hang out" with people much.  (*Id.*)  He used to go to church, but it was his fiancée's church and it was too hard to go back after she died.  (*Id.*)

- He drives to work two or three times a week.  (*Id.* at 52.)  He is able to unload groceries from his mother's car.  (*Id.* at 53.)

The VE testified Ford had past work as a mail clerk.  (*Id.* at 54.)  The ALJ then posed the following hypothetical question:

> At this time, sir, I'd ask you to assume a hypothetical individual with the past jobs you just described. I'd further ask you to assume the hypothetical individual is limited to the following. The hypothetical individual would fall within the exertional category of medium, with the following further restrictions.

> The hypothetical individual would be limited insofar as they would be limited to simple tasks. Limited to routine and repetitive tasks. The hypothetical individual would only occasionally be required to climb, occasionally use ramps and stairs. Never use ladders, scaffolds or ropes.

> The hypothetical individual would be limited to occasional interaction with a small group of coworkers or that contact would be casual in nature.

> The hypothetical individual would be limited to occasional superficial interaction with the public. The hypothetical individual would be limited further insofar as they would not be able to perform at a production rate pace, such as as [sic] an assembly line worker, but could perform goal oriented work, such as as [sic] an office cleaner.
>
> Mr. Salken, with those restrictions, would the hypothetical individual be able to perform the past jobs described earlier in your testimony?

(*Id.* at 54-55.)

The VE testified the hypothetical individual would be able to perform Ford's past work as a mail clerk. (*Id.* at 55.) The VE further testified the hypothetical individual would also be able to perform other representative jobs in the economy, such as dishwasher, cleaner, and warehouse worker. (*Id.* at 55-56.)

The ALJ then modified the hypothetical to have the same restrictions as the first, but the hypothetical individual would fall within the sedentary level of exertion. (*Id.* at 56.) The ALJ asked the VE whether, with that additional restriction, the hypothetical individual would be able to perform Ford's past work. (*Id.*) The VE testified the hypothetical individual could not perform the job as it was classified, but as Ford described performing it. (*Id.*) The ALJ asked the VE whether there was any other work in the national economy the hypothetical individual could perform. (*Id.*) The VE testified there was not. (*Id.*) When asked what limited the jobs so greatly, the VE testified: "At sedentary, the nonexertional impairments of occasional interaction and no production quotas, in my opinion, significantly erodes the unskilled, sedentary job base." (*Id.* at 56-57.)

The ALJ then posed the following hypothetical to the VE:

> For the next hypothetical, if you were to add to either of the earlier hypotheticals the following further restriction, and that would be that the hypothetical individual would find themselves unable to focus and be off task to the point where they'd be off task 20 percent of any given workday.
>
> With that further restriction, would the hypothetical individual be able to perform any of the sample jobs or past work described earlier in your testimony?

13

(*Id.* at 57.)  The VE testified there would be no jobs with that restriction.  (*Id.*)

## III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. § 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. § 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

14

1. The claimant has not engaged in substantial gainful activity since July 20, 2016, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: foot problems, depression, and anxiety (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except the claimant can perform simple tasks that are routine and repetitive. He can occasionally use ramps and stairs, but can never use ladders, ropes or scaffolds. He can have occasional and casual interaction with a small group of co-workers. He can occasionally have superficial interaction with the public. He cannot perform at a production rate pace (e.g., assembly line work) but can perform goal-oriented work (e.g., office cleaner).

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on December **, 1983 and was 32 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963.)

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10. The claimant has not been under a disability, as defined in the Social Security Act, since July 20, 2016, the date the application was filed (20 CFR 416.920(g)).

(Tr. 17-24.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is

supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a

16

decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

Ford asserts, "For the reasons which follow, the ALJ's credibility determination cannot be found to have been supported by substantial evidence." (Doc. No. 11 at 9.) Ford argues the ALJ failed to identify any inconsistencies between his testimony and the record evidence and failed to comply with the requirements of SSR 16-3p. (*Id.* at 9-10.) Later in his brief, Ford acknowledges the ALJ "repeatedly cited [his] employment as a parking garage attendant, as well as his lack of problems with any coworkers, as evidence that he is not as limited as alleged," but asserts this appears to be the "only 'inconsistency'" the ALJ identified and such a conclusion "did not support a finding that [his] allegations are not supported by the medical evidence." (*Id.* at 10.) Ford maintains the ALJ's "incomplete analysis" is not harmless error, as the VE testified a person off-task 20% of a workday "would be incapable of gainful employment," and Ford insists the record in this case "demonstrates this level of impairment." (*Id.* at 11.)

The Commissioner responds the ALJ complied with the regulations and SSR 16-3p, and substantial evidence supports the ALJ's subjective symptom evaluation. (Doc. No. 14 at 6-7.) The

Commissioner maintains Ford waived his argument that he would be off-task 20% of any workday, as he failed to develop it. (*Id.* at 12.) Finally, the Commissioner argues that Ford failed to establish he is more limited than the ALJ's RFC. (*Id.*)

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 416.929(c)(1). *See also* SSR 16-3p,[3] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[4] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be

---

[3] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016. Thus, SSR 16-3 was in effect at the time of the January 9, 2018 hearing.

[4] SSR 16-3p has removed the term "credibility" from the analysis. Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029, at *6. The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 Fed. App'x 113, 119 n.1 (6th Cir. 2016).

clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* 20 C.F.R. §416.929; SSR 16-3p, 2016 WL 1119029 (March 16, 2016).  Beyond medical evidence, there are seven factors that the ALJ should consider.[5]  The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence.  *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Ford's testimony and written statements regarding his mental symptoms and limitations.  (Tr. 20-23.)  The ALJ noted Ford reported his physical and mental conditions became "drastically worse" after his fiancée died, including worsening of his depression and he could not function.  (*Id.* at 20.)  The ALJ also noted Ford's statements that "[h]e has good days and bad days and that he might stay in bed."  (*Id.* at 22.)  The ALJ provided a discussion of Ford's treatment notes, the objective findings upon examination, and the medical opinion evidence.  (*Id.* at 20-23.)  The ALJ determined Ford's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (*Id.* at 20.)  However, the ALJ found his statements concerning the intensity, persistence, and

---

[5] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec*., 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

limiting effects of these symptoms were not entirely consistent with medical evidence and other evidence in the record for the reasons set forth in the decision.  (*Id.*)  Specifically, the ALJ found Ford's statements were "generally inconsistent with the medical evidence."  (*Id.*)

The Court finds substantial evidence supports the ALJ's assessment of Ford's subjective complaints.  The record evidence, as noted by the ALJ, is not entirely consistent with Ford's allegations of disabling mental conditions.  As the ALJ referenced several times throughout the RFC analysis, Ford worked part-time as a parking attendant, denied any difficulty performing his job duties, and denied any difficulty interacting with others while at work.  (*Id.* at 22.)  The ALJ noted Ford said his medications help, "[h]e used coping skills to work on his bad days," and he was motivated to continue working because it took his mind off his fiancée's death.  (*Id.*)  At the hearing, Ford testified he could work more hours as long as he did not have to stand because of the pain in his feet, if the hours were available.  (*Id.* at 41.)  Ford also testified he was doing better with therapy (*id.* at 47), which the ALJ found the medical evidence supported.  (*Id.* at 21-23.)

Ford argues the ALJ "failed to identify any inconsistencies" between his statements about his symptoms and the record evidence and failed to articulate specific reasons for the weight given to his symptoms as required by SSR 16-3p.  (Doc. No. 11 at 9-10.)  The Court disagrees.  Albeit not in a unified paragraph, the ALJ referenced Ford's allegations and then contrasted them with the medical evidence, including examination findings, as well as the opinion evidence.  (*Id.* at 20-23.)  Reading the decision as a whole, it is clear why the ALJ did not accept the entirety of Ford's allegations.  *See* SSR 16-3p, 2016 WL 1119029 (the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.").  While the ALJ's opinion could have been better written and a unified statement would have been helpful, the Court is able to trace the path of the ALJ's

reasoning regarding the ALJ's subjective symptom analysis.  A perfect opinion is not required.  *Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.") (citations omitted); *see also NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 766 n.6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (when "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.").

Further, Ford bears the burden of "proving the existence and severity of limitations" caused by his impairments at Steps One through Four.  *Echols v. Comm'r of Soc. Sec.*, No.18-cv-12386, 2019 WL 3852528, at *6 (E.D. Mich. July 26, 2019), *report and recommendation adopted by* 2019 WL 3842885 (E.D. Mich. Aug. 15, 2019).  Ford asserts he "testified that he did not really interact with coworkers, other than the occasional interaction with his supervisor," and he "also occasionally interacted with the public." (Doc. No. 11 at 10.)  As a result, Ford claims the ALJ's finding that he "has no problem getting along with coworkers is simply not justified based upon the evidence."  (*Id.*)  Ford argues further the consultative examiner considered these factors in rendering his opinion, and "therefore, they can by definition not show an inconsistency, as they were included in the information used by the consultative psychologist in forming his opinion."  (*Id.*)   But the ALJ assigned great weight to the opinion of Dr. Faust, the consultative examiner, and restricted Ford to "occasional and casual interaction with a small group of co-workers" and occasional "superficial interaction with the public."  (Tr. 19, 21-22.)  It is Ford's burden to prove he "has a more restrictive RFC than that assessed by the ALJ."  *Echols*, 2019 WL 3852528, at *6. Nowhere in his brief does Ford acknowledge these limitations assessed by the ALJ, "argue that those limitations are insufficient, or indicate what additional . . . limitations" the ALJ should have assessed.  *Id.* at 7.  Ford therefore fails to meet his burden showing that his ability to interact with others requires any more limitations than those set forth in the RFC.  *Id.*

Ford argues the ALJ's error was not harmless, as the VE testified a person off-task 20% of a work day would be incapable of gainful employment.  (Doc. No. 11 at 11.)  Ford's argument on this issue consists of three sentences, including the blanket assertion, without citation: "As the record demonstrates this level of impairment, a properly document and thorough analysis of Mr. Ford's limitations is vital to a proper determination of this claim."  (*Id.*)  The Court disagrees the ALJ erred, and therefore does not undertake a harmless error analysis.  But even if the Court reached the issue of harmless error, it would agree with the Commissioner that Ford waived this argument by failing to develop it.  *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.")

In sum, the ALJ considered a number of regulatory factors in assessing Ford's subjective statements about his symptoms, including his mental health treatment, examination findings, and the opinions contained in the record.  These factors are supported by the evidence in the record and are sufficiently specific to make the basis of the ALJ's subjective symptom analysis clear.  Accordingly, this argument is without merit and does not provide a basis for remand.  Therefore, it is recommended the ALJ's decision be AFFIRMED.

## VII.  CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date:  June 2, 2020

_ *s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

22

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).